## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**F.H. PASCHEN, S.N. NIELSEN**                          **CIVIL ACTION**
**& ASSOCIATES, LLC,**
         **Plaintiff**

**VERSUS**                                              **No. 12-2799**

**SOUTHEASTERN COMMERCIAL**                             **SECTION "E"**
**MASONRY, INC.,**
         **Defendant**


### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was tried before the Court, sitting without a jury, over two days[1] on the claims of Paschen, S.N. Nielsen & Associates, LLC ("Paschen") against Defendant Southeastern Commercial Masonry, Inc. ("SECM") for breaches of contract for masonry work on two school projects and improperly filing statements of claim and privilege on two public works projects.[2] SECM filed a counterclaim against Paschen for breach of contract, breach of oral contract, and enforcement of statutory liens.[3]

Plaintiff Paschen is a limited liability company organized under the laws of Illinois.[4] The members of Paschen are citizens of Indiana, Illinois, Wisconsin, Michigan, Florida, and New Jersey.[5] Defendant SECM is a corporation organized under the laws of Alabama with its principal place of business in Alabama.[6] This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

---

[1] R. Doc. 60 (continuing trial for one day); R. Doc. 61; R. Doc. 64.

[2] R. Docs. 1 and 4. Paschen's total claim on both projects is $987,612.31. Exh. 42.

[3] R. Doc. 6. SECM's total claim on both projects is $409,931.96.  R. Doc. 67, at 13.

[4] R. Doc. 4.

[5] R. Doc. 4.

[6] R. Doc. 1.

Paschen was the general contractor on two public works projects: the Mildred Osborne School ("Osborne project"), and the Charles J. Colton School ("Colton project"). Paschen entered into two subcontracts with SECM, one to perform masonry work on the Osborne project and the other to perform masonry work on the Colton project. The subcontracts on the Osborne and Colton projects were fixed-price agreements, whereby SECM agreed to perform all of the work within its scope of work under the subcontracts for a set price.[7] Both were fast-track projects.[8] Schedule A to each subcontract describes the work to be done (the "work").[9]  Paschen terminated both contracts with SECM.[10]

The Court heard testimony from Larry Van Zuidam, Mark Waller, John Wilkes, Chris Hase, Rupert Perez, Jeffery Posey, Justin Allen Posey, and admitted into evidence the deposition of Adam Lusk.[11]

With respect to the Osborne project, the Court rules that Paschen is not entitled to recover for its breach of subcontract claim insofar as it is based on SECM's failure to perform and failure to perform in a timely manner.  Nor is Paschen entitled to recover the cost of removing the statement of claim filed by SECM in the public record.  However, Paschen is entitled to recover  the amount it paid to SECM's sub-subcontractor, Tailored Foam, and attorney's fees and costs related to the prosecution of this portion of its claim.

---

[7]Exhs. 1 and 2.

[8]Exh. 1-19; Exh. 2-21.

[9]Exh. 1-17 to 29; Exh. 2-19 to 30.

[10]R. Doc. 44-3, Section 3, Uncontested Material Facts.

[11]Exh. 45.

Further, the Court rules that SECM is entitled to recover on its breach of subcontract claim for the amounts it is owed under Change Order 24 but not for other change order requests or its request for overtime pay and extra crew. Further, the Court rules that SECM is not entitled to recover on its breach of oral agreement claim for its time and material tickets or its claim for attorney's fees.

With respect to the Colton project, the Court rules that Paschen is not entitled to recover for its breach of subcontract claim insofar as it is based on SECM's failure to perform and failure to perform in a timely manner.   Nor is Paschen entitled to recover the cost of removing the statement of claim filed by SECM in the public record or its attorney's fees.  Further, the Court rules that SECM is entitled to recover the amounts due under Pay Application 17 and to recover its retainage due under the subcontract.  SECM is not entitled to recover on Pay Application 18 for back charges related to additional scaffolding costs; Change Orders Change Orders 2, 3, 4, 5, 6, 7, 11, 12, 13, 20 (credit to Paschen) and 22; lost profits on the subcontract; or its attorney's fees.

To the extent any finding of fact may be construed as a conclusion of law, the Court adopts it as such.  To the extent any conclusion of law may be construed as a finding of fact, the Court adopts it as such.

## STANDARD OF LAW

Written contracts are the law between the parties, and courts are bound to enforce contracts as written. *Quinn-L Corp. v. Elkins,* 519 So. 2d 1164 (La. App. 1 Cir. 1987). The essential elements of a breach of contract claim are (1) the obligor's undertaking of an obligation to perform, (2) the obligor's failure to perform the obligation (the breach), and

(3) the breach results in damages to the obligee. *Favrot v. Favrot*, 68 So. 3d 1099, 1109 (La. App. 4 Cir. 2011). The breach of a contractual duty cannot be assumed. *Morgavi v. Mumme*, 270 So. 2d 540 (La. 1972). The burden of proof in an action for breach of contract is on the party claiming rights under the contract. *Vignette Publications, Inc. v. Harborview Enterprises, Inc.*, 799 So. 2d 531, 534 (La. App. 4 Cir. 2001). Thus, Paschen has the burden of proof on its breach of contract claims, and SECM has the burden of proof on its breach of contract counterclaims.

Paschen and SECM must establish the elements of their claims essential to recovery by a preponderance of the evidence. *Bond v. Allemand* 632 So. 2d 326 (La. App. 1 Cir. 1993). "A preponderance of the evidence simply means evidence that persuades [the Court] that the plaintiff's claim is more likely true than not true." 5th Cir. Pattern Civil Jury Instruction 2.20 (West 1998); *see also Layrisson v. H.S.S. Vending Distrib.*, No. 97-1440, 1998 WL 355461, at *2 (E.D. La. June 26, 1998).

Under Louisiana law, if an individual does not complete the work he has contracted to do or fails to execute it in the manner agreed upon, he is liable for the losses that ensue from his non-compliance. La. Civ. Code art. 2769. To establish a subcontractor's liability due to defective workmanship, the general contractor must prove the existence and nature of the defects, that the defects are due to faulty materials or workmanship, and the cost of repairing the defects. *Cascio v. Carpet*, 968 So. 2d 844, 850 (La. App. 2 Cir. 2007).

For a breach of contract claim under Louisiana Civil Code article 2769, the appropriate measure of damages is the cost of repairing any defects or the cost of completing the work. *Mount Mariah Baptist Church, Inc. v. Pannell's Associated Electric,*

*Inc.*, 835 So. 2d 880, 888 (La. App. 2 Cir. 2002). A plaintiff bringing a claim under Louisiana Civil Code article 2769 must prove the costs incurred are reasonably related to the repair. *Regions Bank v. Ark-La-Tex Water Gardens, LLC* 997 So. 2d 734, 739–40 (La. App. 2 Cir. 2008).

The burden of proof is upon the subcontractor to show that it is entitled to the amount requested in a change order request. *Powerhouse Wholesale Electrical Supply v. Spartan Building Corporation*, 525 So. 2d 1216, 1220 (La. App. 1 Cir. 1988).

A written construction contract may be modified by an oral contract and the conduct of the parties, even when the written contract contains a provision that change orders must be in writing. Modification of a written agreement can be presumed by silence, inaction, or implication. *Aqua Pool Renovations v. Paradise Manor Community*, 880 So. 2d 875, (La. App. 5 Cir. 2004). Whether oral agreements were confected that modified a written contract is a question of fact.  *Pelican Electrical Contractors v. Neumeyer*, 419 So. 2d 1, 5 (La. App. 4 Cir.), *writ denied,* 423 So. 2d 1150 (La. 1982).  The party asserting a modification of an obligation must prove by a preponderance of the evidence facts or acts giving rise to the modification. La. Civ. Code art. 1831; *Amitech v. Nottingham Const.*, 57 So. 3d 1043 (La. App. 1 Cir. 2011).

A contract clause providing the architect or engineer shall be the final arbiter of disputes is binding upon the parties to a construction contract, unless the architect or engineer's decision is manifestly erroneous or rendered in bad faith.  Where, therefore, the parties have agreed to abide by the decision of an architect, the courts will hesitate, in the interpretation of the contract, to set aside the architect's ruling, unless manifestly arbitrary,

or it is shown to have been rendered in bad faith. *Delta S. Co., Inc. v. La. & Ark. Ry. Co.*, 394 So. 2d 1299, 1301 (La. App. 1 Cir. 1981). *See also Sabine Const. Co., Inc. v. Cameron Sewerage Dist.*, 298 So. 2d 319, 325 (La. App. 3 Cir. 1974); *Baker v. Keller Const. Co.*, 219 So. 2d 569, 571 (La. App. 4 Cir. 1969); *J. H. Jenkins Contractor, Inc. v. City of Denham Springs*, 216 So. 2d 549, 553 (La. App. 1 Cir. 1968); *see also Iteld v. Four Corners Const., L.P.*, 157 So. 3d 702, 715 (La. App. 4 Cir. 2013).

"Where the promisee makes performance impossible, it is unimaginable that any civilized system of law would allow that promisee to recover damages for the promisor's failure to perform under the contract. It is a long established principle of law that he who prevents a thing may not avail himself of the non-performance he has occasioned. The principle is founded upon the premise that one should not be able to take advantage of his own wrongful act." *Lake Forest, Inc. v. Katz & Besthoff No. 9,* 391 So. 2d 1286, 1289 (La. App. 4 Cir. 1980) (quoting *Cox v. Dep't of Highways*, 209 So. 2d 9, 11 (La. 1968)).

As a general rule, an independent contractor maintains the right to control and direct the scope of its work while in progress. *See, e.g.*, *Villaronga v. Gelpi P'ship No. 3*, 536 So. 2d 1307, 1311 (La. App. 5 Cir. 1988). It is within the purview of the subcontractor to determine how and by what means it performs the work it was contracted to complete. *See id.* Unless stated otherwise in the contract between the parties, the general contractor is unable to exercise any direction or control over the performance of the subcontractor's work. *See Trapani v. Jefferson Parish*, 180 So. 2d 850, 852–53 (La. App. 4 Cir. 1965).

Contractors who control or direct the means, methods, and operations of a subcontractor may be held liable for the actions of that subcontractor. *See, e.g.*, *Sims v.*

*Cefolia*, 890 So. 2d 626, 631 (La. App. 5 Cir. 2004); *Migliori v. Willows Apartments*, 727 So. 2d 1258, 1261 (La. App. 4 Cir. 1999); *Villaronga v. Gelpi P'ship No. 3*, 536 So. 2d 1307, 1311 (La. App. 5 Cir. 1988); *Trapani v. Jefferson Parish*, 180 So. 2d 850, 852–53 (La. App. 4 Cir. 1965).

If a remedy is available at law, recovery is not available under the theory of unjust enrichment. *See SMP Sales Mgmt., Inc. v. Fleet Credit Corp.*, 960 F.2d 557, 559–60 (5th Cir. 1992).

Attorney's fees are recoverable only where provided by contract or statute. *See, e.g., MAPP Const., LLC v. Amerisure Mut. Ins. Co.*, 143 So. 3d 520, 529 (La. App. 1 Cir. 2014) (citing *Avants v. Kennedy*, 837 So. 2d 647, 655 (La. App. 1 Cir. 2002), *writ denied*, 540 So. 2d 1215 (La. 2003); *Thompson v. Copolymer Intern. Inc.*, 446 So. 2d 1339, 1341 (La. App. 1 Cir.), *writs denied*, 449 So. 2d 1041 (La. 1984)) (noting *inter alia* that attorneys' fees must be requested in the initial pleadings); *see also Dennis v. Allstate Ins. Co.*, 645 So. 2d 763, 766 (La. App. 5 Cir. 1994) (citing *Mix v. Mougeot*, 446 So. 2d 1352, 1356 (La. App. 1 Cir. 1984)).

The trial court is vested with great discretion in arriving at an award of attorney's fees. *Lamar Contractors, Inc. v. Kacco, Inc.*, 174 So. 3d 82, 90 (La. App. 4 Cir. 2015) (citations omitted). The exercise of this discretion will not be reversed on appeal absent a showing of clear abuse of discretion. *Id.* A reasonable award of attorney's fees is determined by the facts of each individual case. *Gottsegen v. Diagnostic Imaging Servs.*, 672 So. 2d 940, 943 (La. App. 5 Cir. 1996); *Lamar*, 174 So. 3d at 91. In an action for breach of contract, if it is determined that only a portion of the sought-after damages are recoverable, the court

is within its discretion to award only a portion of the prevailing party's attorney's fees. *See, e.g.*, *Gottsegen*, 672 So. 2d at 943–44. The court may apportion the attorney's fees and award an amount it deems reasonable based on the ultimate outcome of the action. *See Vignette Publications, Inc. v. Harborview Enters., Inc.*, 789 So. 2d 531, 538 (La. App. 4 Cir. 2001) (noting that the Louisiana Supreme Court permits courts to consider "the ultimate result obtained" when fixing attorneys' fees).

As a general rule, attorney's fees are items of special damages that must be specifically pleaded in a party's initial pleadings. *United Industries, Inc. v. Simon-Hartley, Ltd.*, 91 F.3d 962, 764–65 (5th Cir. 1996). However, certain exceptions to this rule permit the court to consider a party's entitlement to attorney's fees, even in the absence of a specific pleading. *See id.* For example, it is well settled that a joint pre-trial order supersedes all pleadings and governs the issues and evidence to be presented at trial. *McGehee v. Certainteed Corp.*, 101 F.3d 1078, 1080 (5th Cir. 1996). Furthermore, where a party fails to plead something in the initial pleadings, its inclusion in the pre-trial order mitigates any allegations of prejudice due to untimely notice. *Allied Chemical Corp. v. Mackay*, 695 F.2d 854, 855–56 (5th Cir. 1983). Thus, courts can allow the introduction of new claims and defenses if they are included in the pre-trial order. *Id. See also Wilson v. Muckala*, 303 F.3d 1207 (10th Cir. 2002) ("[T]he inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim."); Fed. R. Civ. P. 15(b).

Under the Public Works Act, if a subcontractor improperly files a statement or proof of claim in the mortgage records, the general contractor may require that the subcontractor give written authorization directing the recorder of mortgages to cancel the statement or

proof of claim. *See* La. Rev. Stat. § 38:2242.1(A); *see, e.g.*, *Gilchrist Const. Co., Inc. v. Terral Riverservice, Inc.*, 819 So. 2d 362, 364 (La. App. 3 Cir. 2002). The subcontractor must provide the recorder of mortgages such authorization to cancel the statement or proof of claim within 10 days after a written request for authorization is received from the general contractor. *See* La. Rev. Stat. § 38:2242.1(A). Damages are not recoverable for an improperly filed statement or proof of claim, unless the subcontractor fails, after request and without reasonable cause, to deliver the written authorization to cancel the statement or proof of claim to the recorder of mortgages. *See* La. Rev. Stat. § 38:2242.1(B); *see, e.g.*, *L & A Contracting Co., Inc. v. Mabry*, 637 So. 2d 1090, 1093 (La. App. 2 Cir. 1994).

Attorney's fees are recoverable under the Louisiana Public Works Act only if the claimant recovers the full amount of his timely and properly recorded or sworn claim by concursus or separate suit.  La. Rev. Stat. § 38:2246.

In an action for breach of contract, interest is awarded from the date of judicial demand. *See, e.g.*, *National Union Fire Ins. Co. v. Circle, Inc.*, 915 F.2d 986, 992 (5th Cir. 1990); *LAD Servs. of La., L.L.C. v. Superior Derrick Servs., L.L.C.*, 167 So. 3d 746, 763 (La. App. 1 Cir. 2014).

## THE OSBORNE SCHOOL PROJECT

### The Subcontract

The fixed price on the Osborne project was $1,344,000.00.[12]  SECM agreed to "perform and furnish all the work, labor, supervision, services, insurance, plant equipment, tools, scaffolds, appliances, materials, and all other things necessary for the incorporation

---

[12]Exh. 1-1.

into the Project of the work described in Schedule A."[13]  Adam Lusk, Paschen's project manager for the Osborne project, testified that SECM was to furnish and install the concrete masonry units and the brick veneers at the school. The subcontract allowed the parties to increase the price through written change orders issued by Paschen, but the subcontract required change orders to be authorized and agreed to before the subcontract price increased.[14]  During the course of the project, SECM's subcontract was modified by approved change orders resulting in a net increase of $89,299.73 to the subcontract price, bringing the total fixed-price amount to $1,433,299.73.[15]  Paschen paid SECM $1,421,174.52 on the Osborne subcontract.[16]  The remaining contract balance was $12,125.21.[17]

Paschen and SECM agree on these basic facts with respect to the Osborne project and they are the findings of the Court. Beyond the above, the parties dispute most of the facts.

**Paschen's Claims**

Paschen claims it sustained damages in the amount of $180,351.60[18] because SECM breached the subcontract by (1) failing to perform in a timely manner, (2) failing to complete its undisputed scope of work and failing to correct non-compliant work, and (3)

---

[13]Exh. 1-2, paragraph 1, Description of the Work.

[14]Exhs. 1-7 and 1-8.

[15]Testimony of Larry Van Zuidam, Adam Lusk and Jeff Posey; Exh. 3-419; Exh. 10.

[16]Exhs. 8A and 3-417. The amount paid to SECM was stipulated by the parties.

[17]Exh. 3-380; Exh. 8, and stipulation of the parties. John Wilkes testified that this was not an accurate representation of the value of the work left to be done on the subcontract but he did not testify as to what the accurate amount was.

[18]Exh. 42-1.

improperly filing a statement of claim on this public works project.[19] Paschen also claims SECM breached its subcontract by failing to pay all of its sub-subcontractors, namely Tailored Foam, and failing to reimburse Paschen for Paschen's payment to Tailored Foam.[20] Paschen calculated its damages by adding the costs incurred to correct and complete SECM's work (including its payments to Tailored Foam) and the costs for cancelling the allegedly wrongly filed statement of claim, for a total of $192,476.81, and subtracting the remaining contract balance of $12,125.21.[21]

Paschen alleges SECM breached the subcontract by failing to perform timely and failing to perform or correct its work and that, as a result, it had the right to terminate the subcontract, complete the work itself, and recover the cost of labor and materials for the work from SECM.  Paschen relies on Section 24 of the subcontract, which provides that it shall be an event of default for the subcontractor to fail to prosecute the work with promptness and diligence, or to fail to perform in accordance with any of the terms or provisions of the agreement or of the other contract documents.[22]  The subcontract further provides that, upon the occurrence of an event of default, the contractor shall  have the right, in addition to any other remedies under the subcontract or under law, after 48 hours notice to the subcontractor: (1) to perform and furnish any such labor and materials for the work and to deduct the cost from amounts due to the subcontractor, or (2) to terminate the

---

[19]R. Doc. 66 at 1.

[20]R. Doc. 66 at 4.

[21]R. Doc. 66 at 5-6.

[22]Exh. 1-14.

subcontractor and complete the work itself.  Before the subcontract may be terminated and Paschen may recover its cost to complete the work, Paschen must prove that there was an event of default under the subcontract.

With respect to Paschen's claim that SECM's failure to perform in a timely manner was an event of default, Mr. Van Zuidam, Paschen's operations manager, testified, and Exhibit 1-57 reflects, that SECM originally signed the subcontract on July 12, 2011, and Paschen signed the subcontract on July 19, 2011.[23]  SECM claims and Paschen admits that the Osborne project was behind schedule even before SECM began working on the project around May 2011.[24]  Jeff Posey, the president of SECM, testified that Paschen was four months behind schedule when SECM came on the job.  Adam Lusk, Paschen's project manager for the Osborne project, testified that SECM delayed Paschen's work on the project because SECM failed to begin the work on time, but SECM points out that the delay occurred before it became involved in the project.  Mr. Lusk identified the June 16, 2011 letter[25] as notice of default to SECM under the subcontract that had not yet been signed. Mr. Lusk testified that, at that time, a notice to proceed had been given to SECM and, as a result, SECM was obligated to begin work even before the subcontract was signed.  No evidence of a notice to proceed was introduced into evidence.  In the June 16, 2011 letter, Mr. Lusk acknowledges that SECM had concerns about there not being enough work

---

[23]Exhibit 1-57.

[24]Testimony of Jeff Posey and Larry Van Zuidam.

[25]Exh. 25-2 and Exh. 26-44.

available on the job when SECM deployed its crews.[26]

Mr. Van Zuidam testified that as time passed SECM's lack of manpower on the job caused the project to get even further behind.[27]  An email from Mr. Van Zuidam to Jeff Posey on January 23, 2012, included a complaint that the SECM masons were not on site and threatened to hold SECM in default.[28] Jeff Posey responded on January 24, 2012, that he was putting his "guys back to work" the following morning.[29] The subcontract provided that, upon the occurrence of an event of default, Paschen had the right after 48 hours notice to SECM to perform and furnish labor and materials for the work and deduct the cost from any moneys due or that may become due to SECM.[30] On July 10, 2012, Paschen sent SECM a 48 hour notice letter informing SECM that its "lack to [sic] adequately schedule and provide manpower at the [Osborne project] has unreasonable [sic] impacted and delayed the completion of the project schedule" and "that if the above-mentioned items are not addressed with [sic] 48 hours by written notice or action FHP/SNN will supplement your scope of work and all costs will be borne on Southeastern Commercial Masonry" (the "48 hour notice letter").[31] On July 13, 2012, Paschen sent SECM an email, captioned "Osborne 48 hour notice," informing SECM that it must correct its deficiencies and complete its scope

---

[26]Exh. 26-44.

[27]Larry Van Zuidam testified that SECM abandoned both the Osborne and the Colton project, but no witness provided specific testimony regarding SECM's failure to be on either job when there was sufficient work available to be performed.

[28]Exh. 26-27.

[29]Exh. 26-26.

[30]Exh. 1-6, 1-7, 1-14.

[31]Exh. 25-28.

of work in accordance with the subcontract.[32]  The email acknowledged that SECM was back on the job site and said that a schedule would be forwarded to "complete the contract scope of work as outlined."[33]

Paschen argues that the testimony set forth above has proven by a preponderance of the evidence that SECM failed to perform the subcontract in a timely manner.  The Court finds that Paschen has failed to meet its burden of proof on this issue.  The fact that SECM did not begin work until May 2011 is not proof that SECM failed to begin its work in a timely manner or delayed the overall project. The Osborne subcontract was behind schedule before the subcontract with SECM was even signed, and Paschen did not prove that this delay was attributable to the actions of SECM. Mr. Wilkes could not remember whether the project was behind schedule before SECM started work, and Mr. Lusk could not identify specific portions of Paschen's work that were delayed by SECM's conduct.  Instead, Mr. Lusk testified only generally that SECM was behind on its entire scope of work.  Paschen had difficulties with other subcontractors on the project, and Paschen did not prove that those subcontractors did not contribute to the delays.[34]  Exhibit 36-2 shows backcharges to 16 subcontractors, only one of whom was SECM.[35]  Paschen did not identify specific occasions on which work was ready to be done that SECM failed to provide manpower to do the work and the project was delayed as a result.  The evidence that was introduced was

---

[32]Exh. 25-23 to 24.

[33]Exhh. 25-23 to 24.

[34]Testimony of John Wilkes.

[35]Exh. 36-2.

vague and conclusory.  Although Paschen sent SECM a 48 hour notice letter including "failure to perform in a timely manner" as a ground of default, Paschen failed to meet its burden of proving that the default actually occurred. Furthermore, SECM was on the job two days after it received the 48 hour notice letter and Paschen promised on July 13, 2012, to send SECM a schedule for completion of the contract work, but none was sent.[36] Undoubtedly, there were disagreements between the parties about SECM's presence on the job and whether its absences caused the project to fall behind schedule.  Paschen's witnesses complained that the SECM laborers were pulled off the job when there was work to be done.[37]  Jeff Posey responded that SECM workers were on the job when the work was ready and that SECM did not cause delays.  In the final analysis, Paschen had the burden of proving that there was an event of default because SECM failed to perform in a timely manner.  Paschen failed to present sufficiently specific evidence to meet that burden.[38]

Paschen also claims that SECM's failure to complete or correct the work as required under the terms of the subcontract was an event of default entitling it to terminate the subcontract and recover its cost to complete the work.  Paschen has failed to prove by a preponderance of the evidence that SECM breached the subcontract by failing to perform or to correct work under the subcontract.

Paschen relies on its notices of default sent to SECM to prove that SECM failed to

---

[36]Exh. 25-24.

[37]Testimony of Larry Van Zuidam and John Wilkes.

[38]Furthermore, for the reasons stated below, even if there was an event of default because of SECM's failure to timely perform, Paschen would not be entitled to recover because it has failed to prove its costs to complete or correct the work by a preponderance of the evidence.

perform under the subcontract. Mr. Lusk testified at trial that SECM failed to complete the monument sign work, the punch list, and some exterior pillars.  In his July 13, 2012 email, Mr. Lusk informed Jeff Posey that remaining work included "punch list and major tuck pointing throughout the project."[39] John Wilkes, Paschen's superintendent for the State of Louisiana,  testified that Mr. Lusk is the person who could testify as to whether a punch list was sent to SECM.  Mr. Lusk testified that he thought a punch list "would have been" provided to SECM prior to the July 13, 2012 email, but no punch list is attached to the email and Mr. Lusk  had no personal knowledge that a punch list had been sent to SECM.  Mr. Wilkes testified that Exhibit 44, a punch list dated September 24, 2013,  represented the punch list for the Osborne project, but  Mr. Wilkes could say only that it "tells a pretty good story of what the architect was not willing to accept."[40] In effect, Mr. Wilkes was able to give only his overall observations about the work left to be done on the SECM subcontract.  He could not give exact numbers of units of work that remained to be performed and could identify no exhibit that set forth in detail the remaining work. Mr. Wilkes did not know whether the punch list introduced into evidence as Exhibit 44 was sent to SECM. Counsel for SECM also directed Mr. Wilkes to Exhibit 26, which is a punch list dated July 19, 2012. Mr. Wilkes did not know whether this punch list was sent to SECM and did not know the difference between Exhibits 26 and 44, the two punch lists presented to him.  Paschen introduced no testimony that a punch list was sent to SECM before Paschen terminated the

---

[39]Exh. 25-23.

[40]Counsel for SECM indicated at trial that Exh. 44 was dated September 24, 2012, but in reality different pages of the exhibit have different dates in 2013. There is a column in the middle of each page of the exhibit apparently reflecting the date the entry was added to the exhibit.

subcontract.[41]

In the July 13, 2012 email, Mr. Lusk acknowledged that SECM was back on the job as of July 12, 2012, and said in his email that "a schedule will be forwarded to complete the contract scope of work as outlined."[42] Pay Application 25 dated May 9, 2012, well before the 48-hour notice letter, showed that the work was 99.97 percent "complete and stored to date" and that the quality of the work is in accordance with the contract documents.[43] Pay Application 25 included a Form G-703 showing that the majority of work on the project is 100 percent complete.[44]  The only items shown as not complete on the form, which was signed by Paschen, are the monument sign and the installation of the brick veneer for the monument sign.[45]  Mr. Lusk testified that the exterior fence pilasters had some deficient work and that the punch list items also needed to be complete. Mr. Van Zuidam testified the work was not 99.97 percent complete at that time, but he did not specify what work was completed and what was not completed.  Justin Allen Posey testified that in January 2012 Pay Application 16 shows the work was 90.5 percent complete.[46]  He testified further that

---

[41]Jeff Posey did testify that SECM had worked on punch list items, so it appears that SECM did see some version of a punch list, but Mr. Posey testified that this occurred before the subcontract was terminated. At the time of termination, SECm was not provided a list of what work remained to be done under the subcontract.  Furthermore, the Louisiana Public Works Act requires that the punch list include cost estimates for each item of work and that the design professional retain his working papers used to determine the estimates should the matter be disputed later.  La. R.S. 38:2248(B).  This was not done in this case with respect to Exhibits 26 and 44, which were the only punch lists introduced into evidence.

[42]Exh. 25-24.

[43]Exh. 3-417.

[44]Exh. 3-384 to 385.

[45]Exh. 3-417.

[46]Exh. 3-251.

by May 2012 the work was 99.9 percent complete and Paschen had already paid SECM over $100,000.00 in time and material tickets to do change order work.

Jeff Posey responded to Paschen's 48 hour notice letter via email, stating SECM "had men onsite when asked."[47] SECM also requested an itemized list of work left to be completed on the Osborne project and informed Paschen that it could have a "crew ready and available to start work as soon as [Paschen gave SECM] the list of available work." Jeff Posey testified that SECM had done everything that was ready to be done on the project and was willing to return to complete the project, but Paschen never called SECM to come back to complete the remaining work. He also testified that the only instances when SECM was not at the Osborne project was when SECM "had head on work, caught up on work, or there was something going on between [SECM] and Paschen where we agreed we weren't going to be [onsite]."  Jeff Posey testified that Paschen was behind schedule on the Osborne Project and the only remaining work on the Osborne project for SECM was work to be done on a time and material basis. Jeff Posey also testified that SECM did not complete the fence pilasters or the monument sign, but this was because the work was not ready to be done at the time SECM was terminated and that SECM gave Paschen a credit for these items.  Mark Waller of Tailored Foam testified that SECM's work on the Osborne project was done in a "professional manner."  No evidence was introduced to establish SECM's last day on the job or what work remained to be performed or corrected at that time.

Paschen did not send a punch list to SECM with the 48 hour notice letter and did not give SECM the opportunity to finish the work. Paschen did not send and SECM did not

---

[47]Exh. 25-24.

receive the July 19, 2012 punch list or the September 24, 2012 punch list.  Instead of sending a punch list to SECM and allowing it an opportunity to do the work, Paschen terminated the subcontract and did not allow SECM to finish the work under the subcontract even though SECM was ready and willing to do so.  Paschen did not introduce any evidence linking specific items listed in either punch list to the work described under the subcontract which SECM allegedly failed to perform or correct. Paschen did not establish the last day that SECM worked on the Osborne project and what the status of the project was at that time. Mr. Wilkes said that Paschen "probably" had photo documentation of the work that needed to be done or redone by SECM.  The Court finds it telling that no photographs of defective or incomplete work on the Osborne project were introduced into evidence by Mr. Wilkes or any other Paschen witness.  Paschen failed to meet its burden of proving that the defaults alleged in the 48 hour notice letter actually occurred.

Even if Paschen had proven that an event of default occurred, Paschen failed to prove its costs for labor and materials necessary to complete the work by a preponderance of the evidence.   Paschen offered Exhibit 42-1,"FHP Expenses to Correct/Complete," as a summary of the amounts  it expended to complete or correct the work that was included in the scope of work under the subcontract.[48]  Paschen offered Exhibits 30 and 36 as the source of the information in Exhibit 42-1.  Paschen argues that its payment of the amounts shown in Exhibit 42-1 proves that SECM failed to complete or correct the work.   The total expenses claimed by Paschen are $192,476.81.[49]

---

[48]Exh. 42-1 also includes the payment Paschen made to Tailored Foam.

[49]Exh. 42-1.

Mr. Lusk testified that the cancelled checks and invoices for materials bought to complete the masonry work are compiled in Exhibit 30. The only items he offered specific testimony about were the payment made by Paschen to Tailored Foam[50] and Paschen's hiring of TIC Construction to complete a portion of SECM's work. He did not testify with respect to the other payments included in Exhibit 30. Mr. Van Zuidam testified that Exhibit 30 comprises the joint checks written by Paschen to SECM's vendors or suppliers, which was contradictory to the testimony of Mr. Lusk. Mr. Wilkes testified that he was involved in the correction and completion of the work under the SECM subcontract. He identified Exhibit 30 as the records of some of the vendors who helped complete the project.  He did not identify each vendor or supplier in Exhibit 30 and offered no proof that the work performed or materials supplied were necessary to complete or correct the work SECM was obligated to do under the subcontract.

Mr. Wilkes testified that Exhibit 30 is the basis for the materials distribution portion of the report in Exhibit 36. Chris Hase, Paschen's senior operations manager for its New Orleans division, testified that Paschen's cost distribution reports, introduced into evidence as Exhibit 36, represented all labor and materials provided by Paschen to complete and correct the work under the project. Mr. Hase testified that Exhibit 36 tracks the costs incurred on the project, including those incurred after SECM abandoned the job, but Mr. Hase was only able to explain generally the method by which tracking codes are assigned by Paschen to various projects. Mr. Hase had no personal knowledge whether the work reflected on Exhibit 36 was actually performed or the materials were provided in connection

---

[50]Exh. 30-347.

with the Osborne project or whether the work and materials were necessitated by SECM's failure to perform or correct work under the subcontract. Neither could he testify whether the work was needed to repair damage done to SECM's work by other subcontractors. He was unable to determine from Exhibit 36 what materials or equipment were actually used on the Osborne project.[51] Mr. Hase admitted that Exhibit 36 only tracks what other Paschen employees attributed to the project, and he had no way to determine whether the attribution was accurate. Finally, Mr. Van Zuidam acknowledged that some of the expenses listed on Exhibit 36 were paid before the 48 hour notice letter was delivered to SECM.

The testimony of Mssrs. Lusk, Van Zuidam, Wilkes, and Hase, as well as the exhibits introduced, failed to establish that the expenses listed in Exhibit 42-1 were made necessary by SECM's failure to complete or correct work that was to be done by SECM under the subcontract. No witness testified from personal knowledge that Exhibits 30 and 36, the sources of the information in Exhibit 42-1, accurately reflect costs for labor and material provided by Paschen to correct or complete work that should have been done by SECM under the subcontract.

Neither have the individual elements of damage shown in Exhibit 42-1 been proven by a preponderance of the evidence to be the costs expended by Paschen to complete the work. The first item requested by Paschen is $62,206.47 for labor. Mr. Van Zuidam testified this amount represented actual labor costs made necessary by SECM's failure to perform but, after looking at the time cards,[52] he could not identify what work was

---

[51] The same is true for Exhibit 37 with respect to the Colton project.

[52] Exh. 43

performed by whom or where. Further, some of the entries in Exhibit 43 are for labor performed before the 48 hour notice letter.[53]  Paschen failed to meet its burden of proving which, if any, of these labor costs were necessary to complete or correct work that SECM was required to perform under the subcontract.

The second item is for "material" in the amount of $101,471.62.[54] Mr. Van Zuidum and Mr. Lusk testified that Paschen was required to pay $52,901.70 directly to Tailored Foam, SECM's subcontractor,[55] and that this amount is included in the $101,471.62 shown for material. Mr. Van Zuidum testified there was not enough money left on SECM's contract for this to be paid as a joint check, and as a result the money was paid to Tailored Foam directly. Mr. Van Zuidam and Mr. Lusk testified that SECM had already been paid for this portion of the work but had failed to pay Tailored Foam. SECM did not contradict this testimony. The Court notes that the parties stipulated that Paschen made direct payments to certain SECM subcontractors in the Joint Pre-Trial Order.[56]  Another portion of the $101,471.62 for materials on Exhibit 42-1 was an amount paid to remove the lien placed on the Osborne project by SECM.  Mr. Hase testified that Paschen paid $2,329.00 in bonding costs to have SECM's improperly filed statement of claim removed.[57]  There was no testimony with respect to the remainder of the costs included in the $101,471.62.

---

[53]For example, Exh. 43-1.

[54]Exhibit 42-1.

[55]Exhibit 30-347; Exh. 36-16.

[56]R. Doc. 44 at 3.

[57]Exh. 36-19.

Paschen has proven by a preponderance of the evidence that SECM was obligated to pay but failed to pay Tailored Foam, that as a consequence Paschen paid $52,901.70 to Tailored Form on behalf of SECM, and that Paschen has not been reimbursed this amount. Recovery of the amount paid to Tailored Foam will be addressed below.

With respect to the amount paid by Paschen to remove the statement of claim filed by SECM, there is no blanket prohibition against statements of claim being filed on public works projects.  Instead, such statements are authorized under the Public Works Act. Further, no testimony was introduced that Paschen demanded that SECM provide written authorization directing the recorder of mortgages to cancel the statement or proof of claim. *See* La. Rev. Stat. § 38:2242.1(A); *see, e.g.*, *Gilchrist Const. Co., Inc. v. Terral Riverservice, Inc.*, 819 So. 2d 362, 364 (La. App. 3 Cir. 2002). Damages are not recoverable for an improperly filed statement or proof of claim, unless the subcontractor fails, after request and without reasonable cause, to deliver the written authorization to cancel the statement or proof of claim to the recorder of mortgages. *See* La. Rev. Stat. § 38:2242.1(B); *see, e.g.*, *L & A Contracting Co., Inc. v. Mabry*, 637 So. 2d 1090, 1093 (La. App. 2 Cir. 1994). Paschen has not proven by a preponderance of the evidence that the lien was wrongly filed, and Paschen is not entitled to recover its costs to have the lien removed.[58]

No testimony was offered as to the derivation of the remainder of the amount included in item two for material, and Paschen has not met its burden of proving that the amounts were necessary to complete or correct work on the project that should have been done by SECM.

---

[58]The same is true with respect to the Colton project.

The third item on Exhibit 42-1 is for equipment used to complete work on the project. Mr. Van Zuidam was unable to identify what equipment was used or to identify the part of the work under the subcontract that the equipment was used to complete or correct. Paschen failed to meet its burden of proving that these costs were to complete or correct work under the subcontract.

The fourth item on Exhibit 42-1 is $15,536.00 for a replacement contractor, which Paschen identified as TIC Construction. Paschen's Purchase Order to TIC Construction for work on the Osborne project in the amount of $10,000 is dated June 15, 2012,[59] well before the 48 hour notice was given to SECM. The TIC invoices are dated June 30, 2012, also before the date of the 48 hour notice letter.[60] Mr. Van Zuidam could not describe the work that TIC performed. Paschen failed to identify the work done by TIC or to show that it was necessary to complete or correct work done by SECM. Paschen has failed to meet its burden of proving that the replacement contractor was necessary to complete or correct work that was to be done by SECM under the subcontract.

Paschen also alleges that SECM breached the subcontract by failing to pay its own sub-subcontractor, Tailored Foam, and by failing to reimburse Paschen for the amount Paschen paid to Tailored Foam,[61] and that this is a breach of the subcontract for which Paschen is entitled to recover. Paschen has proven by a preponderance of the evidence that SECM breached the subcontract by failing to pay its sub-subcontractor, Tailored Foam, and

---

[59]Exh. 31

[60]Exh. 36-26.

[61]Exh. 30-345.

by failing to reimburse Paschen for the amount Paschen paid to Tailored Foam. Paschen is entitled to recover $52,901.70 under Section 24 of the subcontract. Otherwise, Paschen has failed to meet its burden of proving that SECM breached the subcontract by any other actions. Paschen also has failed to prove by a preponderance of the evidence its costs for labor and materials necessary to complete the work. As a result, it is entitled to recover no other damages.

## SECM's Counterclaim

SECM claims it is entitled to recover amounts for work it performed and materials it furnished under the subcontract but for which Paschen has not paid. SECM also claims it is owed for work outside the scope of the subcontract performed under an oral agreement with Paschen to pay for certain work on a time and material basis.[62] SECM seeks damages in the amount of $199,413.67[63] for amounts due on Time and Material Tickets 2 through 5 minus what was paid on Change Orders 6 through 19;[64] overtime hours and crew, plus ten percent overhead and ten percent profit; and Change Orders 4, 17, 24, 26, 27, 28, and 30.[65]

Under Louisiana law, SECM must prove that it is entitled to be paid under either an

---

[62]In SECM's counterclaim, R. Doc. 6, and in the Amended Joint Pre-Trial Order, R. Doc. 44, SECM sought damages for unjust enrichment. SECM failed to brief its entitlement to damages under this theory in its post-trial memorandum. R. Doc. 67. Instead, SECM relies on its two subcontracts with Paschen. Exh. 1 and Exh. 2. SECM admits that, if there is a contract, it is not entitled to damages under the theory of unjust enrichment. The Court has found that there are contracts between the parties and, to the extent SECM's claims are based on unjust enrichment they are dismissed with prejudice.

[63]R. Doc. 67 at 11.

[64]T & M Ticket 1 in the amount of $1,498.41 was included in and paid in connection with Change Order 1, and the parties agree it should not have been listed on Exhibit 39-1 as an amount unpaid. SECM is now requesting payment of only T & M tickets 2 through 4. R. Doc. 67 at 10.

[65]The change orders approved and paid by Paschen are listed on Exhibit 3-414 under Item Number 250.

oral agreement or a change order request by a preponderance of the evidence. The Osborne subcontract provides that the contractor may direct the subcontractor to provide additional labor or supervision and to work overtime, and, if so directed, the subcontractor shall provide said overtime or additional labor or supervision. The subcontract also provides that only if the subcontractor is not in default and the progress of the work has not been delayed by the subcontractor is the subcontractor to be paid for such overtime or additional labor.[66] Jeff Posey testified that, because Paschen was behind schedule, Paschen and SECM entered into an oral agreement for SECM to provide some work on the project on a time and material basis to be performed at the direction of Paschen. Jeff Posey testified that Mr. Lusk agreed Paschen would pay on a time and material basis for SECM (1) to complete work SECM had previously been told to leave uncompleted so other subcontractors could complete their work, and (2) to repair work performed by SECM but later damaged by other subcontractors.

SECM points to Mr. Van Zuidam's email to Jeff Posey on January 24, 2012, in which he acknowledged that SECM's repair of damage by other trades "is easily taken care of by back charging the offending contractor,"[67] as proof that Paschen entered into the oral agreement. Jeff Posey pointed to Change Order 6,[68] Change Order 7,[69] Change Order 8,[70]

---

[66]Exh. 1-6 to 7.

[67]Exh. 26-26. See also Exh. 26-1, a letter from Paschen to SCEM agreeing that work will be done on a time and material basis.

[68]Exh. 10-14.

[69]Exh. 10-17.

[70]Exh. 10-25.

and Change Order 9,[71] when Paschen paid time and material tickets submitted by SECM and, as additional proof of an oral agreement that SECM would do work on a time and material basis.  Paschen does not deny that it agreed to pay for some work on a time and material basis but claims that it has paid for all authorized work done on that basis.[72]  The Court finds that SECM has proven by a preponderance of the evidence that Paschen and SECM entered into an oral agreement for Paschen to pay SECM for work on a time and material basis.

SECM relied on Exhibit 15 to provide documentation of the amount of its time and material claims that Paschen agreed to pay. On cross-examination, Jeff Posey acknowledged that much of the time included in the time and material tickets was also included in various change orders and had been paid. Mr. Posey admitted that part of the time in T & M Ticket 2 (in the amount of $10,396.66 for additional labor from December 20, 2011 to February 23, 2012) was included in Change Orders 6, 7, and 8[73] for which no claim is being made, and that part of T & M Ticket 5 (in the amount of $9,826.49 for work done between April 11, 2012 and April 20, 2012) was included in Change Order 19[74]  for which no claim is being made.  No back-up was provided in Exhibit 15 for T & M Tickets 3 and 4.[75]   Jeff Posey admitted that some of the time charged in T & M Ticket 3 (for work done between March

---

[71]Exh. 10-27.

[72]Testimony of Adam Lusk; Exh. 45.

[73]Exh. 10-14 through 28.

[74]Exh. 14-47.

[75]Exh. 15-21 through 24.

7, 2012 and March 15, 2012)[76] was included in Change Order 16 for which no claim is being made.  Jeff Posey testified that SECM did not have complete documentation on the time and material tickets because the work was directed by Paschen and the field tickets documenting the work were given to "Joe," Paschen's superintendent. Jeff Posey admitted he did not know which tickets or parts thereof had been paid and which had not. Justin Allen Posey testified that SECM's time codes and time cards do not track the specific work being performed on any given day.  No SECM witness tied the time and material tickets to specific work done by SECM. As such, SECM has failed to prove by a preponderance of the evidence what portion of the time and material tickets remained unpaid or what work was done under each ticket.  As a result, SECM has failed to prove that Paschen entered an oral agreement to pay  the amounts charged under T & M Tickets 2 through 4 and has failed to prove that it is entitled to be paid these amounts.

SECM is also seeking payment for overtime and extra crews it provided on the project and mobilization costs, plus 10 percent for overhead and 10 percent for profit, in the total amount of $86,134.15.  Mr. Van Zuidam testified that SECM was behind schedule through its own neglect and any overtime or extra crews needed were to be supplied by SECM at its own cost.   SECM relied on its payroll report for the job, Exhibit 38-214, as support for the amount of this claim. Justin Allen Posey, SECM's Chief Financial Officer, testified that Paschen requested that SECM employees work extra hours and that SECM hire extra crews, but he could not remember who made the request or to whom it was made and there is no written evidence of the request. The SECM accountant who prepared Exhibit

---

[76]Summary in Exh. 15-21 and 22. Exhibit 10-50 Change order 15.

38-214 did not testify.  Justin Allen Posey identified the document but was not able to testify as to its veracity or explain the discrepancies between Exhibit 38-214 and Exhibit 38-1, which also relates to charges for overtime and extra crews.  He admitted that SECM's accountant may have made mistakes when preparing Exhibit 38-214.  Justin Allen Posey testified that no workers were paid overtime on the project but some were paid straight time for hours worked in excess of 40 hours a week.  Justin Allen Posey did not know whether any of the labor charges on Exhibit 38-214 were for work in addition to the scope of work described in the subcontract.  SECM has not met its burden of proving that Paschen and SECM entered into an oral agreement for Paschen to pay for overtime and extra crews. Neither has SECM proven that it is entitled to be paid these amounts.

SECM claims it is entitled to payment for Change Order 4 because its installation of control  joints  in concrete masonry units ("CMUs") was outside the scope of work under the subcontract.[77]  Mr. Van Zuidam described the joints as "control" joints and said they allow for expansion and contraction within the wall itself and thus prevent cracking. The parties agree that some of the walls constructed under the Osborne subcontract were made of CMUs, which are large rectangular blocks made of concrete used in building construction.[78]  SECM admits it agreed to install control joints in brick walls and CMUs where the control joints in both coincided, but SECM disputed that it was required to install additional control joints in CMUs where such joints did not coincide with joints in the brick

---

[77]The parties sometimes refer to these joints as expansion joints and sometimes as control joints. The parties did not distinguish between these kinds of joints and neither does the Court in this opinion.  The joints are referred to as control joints herein.

[78]Concrete masonry units are commonly referred to cinder blocks but a cinder block is merely one kind of CMU.

walls.[79] Revised Change Order Request 4[80] was submitted by SECM seeking an increase in the contract price in the amount of $44,210.36 for materials and labor necessary to install the additional control joints in CMUs.[81]  Jeff Posey testified that Paschen approved the installation of control joints in CMUs before the work was done but then refused to approve the change order request to pay for the work.  Jeff Posey also testified that Mr. Lusk asked for a price for installing the control joints and that SECM gave Paschen a price of around $53,000. Jeff Posey testified that Mr. Lusk told him to go ahead with the work.

Jeff Posey further testified SECM was working on two other jobs for Paschen with plans that clearly documented control joints being installed throughout the project, including in CMUs. Jeff Posey testified that, because control joints for CMUs were not shown in the plans for the Osborne project, they were not included in the scope of the work. Jeff Posey showed the plans for the two other projects to Paschen representatives to attempt to convince them that the control joints for CMUs were not included in the scope of the work on the Osborne project, but Paschen remained unconvinced. Paschen's witnesses testified that the company did not approve Change Order 4 or otherwise agree to pay SECM for installing the control joints because the work, as defined in the subcontract, included installing control  joints in not only brick walls but also CMUs.[82]

Item No. 69 of the Osborne subcontract provides that the Work shall include

---

[79]Exh. 26-46.

[80]Exhibit 14-77.

[81]The parties agreed that SECM was required to install the control joints in brick.

[82]Exh. 1-23; 21-23; Testimony of Larry Van Zuidam.

furnishing and installing "any and/or all miscellaneous masonry accessories including specifically but not limited to any and/or all pre-formed control joint gaskets, weep/vent products, cavity drainage materials, reinforcing bars, reinforcing bar positioners, etc. as indicated in the contract documents as specified as required. Reference Specification Section 042000."[83] Item No. 71 provides the contractor will "Furnish and Install any and/or all control and/or expansion joints indicated in the contract documents as specified as required. Reference Specification Section 42000." Section 42000 of the specifications, Unit Masonry, Section 3.10, Control and Expansion Joints,[84] requires that the contractor shall "Install control and expansion joint materials in unit masonry as masonry progresses" and the contractor shall not "allow materials to span control and expansion joints without provision to allow for in-plane wall or partition movement."[85] Section E, added to Section 3.10 in handwriting before the contract was signed,[86] calls for the installation of control joints per Brick Industry Association Guidelines and provides that the installer should "coordinate control joint locations with architect in field."[87] Paschen points to these contractual provisions as support for its position that SECM is not entitled to be paid the amounts claimed in Change Order 4 because the cost of control joints in CMUs should have been included in the contract price.[88]

---

[83] Exhibit 1-23.

[84] Exh. 21-23.

[85] Larry Van Zuidam testified that Subsection C of Section 3.10 applies only to brick veneer walls.

[86] Testimony of Larry Van Zuidam.

[87] Exhibit 21-23. Larry Van Zuidam testified that this provision applies only to brick veneer walls.

[88] Testimony of Larry Van Zuidam.

SECM claims that  Item No. 71 of the subcontract calls only for the installation of control joints "as specified as required" and that no control joints are specified because they are not shown on the drawings for the project.[89]   Jeff Posey further testified that the architectural drawings for the Osborne project showed no control joints. Jeff Posey testified that the architectural drawings[90] showed control joints for the brick walls but not for the CMUs. No Paschen witness contradicted this testimony. Jeff Posey also testified that the specifications for the Osborne project, Section 3.10, Control and Expansion Joints,[91] do not require the installation of control joints in CMUs.  SECM argues that Section 3.10 only applies to brick and not to CMUs. Jeff Posey pointed out the difference between the specifications for masonry on the Colton project,[92] which specifically describe the control joints to be installed, and the specifications for the Osborne project, which do not. Jeff Posey testified that he directed Scott Johnson to write a letter to Mr. Lusk explaining SECM's position and pointing out that the only specifications for the Osborne project were the Brick Industry Association guidelines which do not apply to CMUs.[93] Even though Mr. Van Zuidam admitted that the plans and specifications for the Osborne project do not show where the control joints in CMUs would be located, he testified that every mason would know where the control joints were to be installed and it was not necessary that they be in

---

[89]Exh. 22.

[90]Exh. 22.

[91]Exh. 21-23.

[92]Exh. 23-5, 19.

[93]Exh. 26-46.

the drawings to be included in the work. Jeff Posey admitted that the National Concrete Masonry Association issued a publication with diagrams regarding the placement of control joints[94] but testified that this represents only the minimum requirements recommended by that organization and does not affect the scope of the work under the Osborne subcontract.

Because of this disagreement between SECM and Paschen, SECM submitted Request for Information 194 with respect to the control joints. The Osborne subcontract provides that "The decision of the owner or the owner's designated representative as to the true construction, meaning and intent of the plans and specifications shall be final and binding upon the parties hereto."[95] The owner's representative is the architect. The architect on the project denied RFI 194,[96] and as a result Paschen did not approve Change Order Request 4.[97] The subcontract included a clause providing the owner's designated representative, in this case the architect, shall be the final arbiter of disputes. Such clauses are binding and enforceable upon the parties to a construction contract, unless the architect's decision is manifestly erroneous or rendered in bad faith.  In this case, the architect's decision was not clearly erroneous.  Ample support for the architect's position is found in Item No. 71, which provides the contractor will "Furnish and Install any and/or all control and/or expansion joints indicated in the contract documents as specified as required. Reference Specification

---

[94]Exh. 21-165.

[95]Exh. 1-2.

[96]Exh. 25-30 through 32 contains the architect's rejection of RFI 194.

[97]Testimony of Larry Van Zuidum.

Section 42000."[98] Section 42000 of the specifications, Unit Masonry, Section 3.10, Control and Expansion Joints,[99] requires that the contractor shall "Install control and expansion joint materials in unit masonry as masonry progresses" and shall not "allow materials to span control and expansion joints without provision to allow for interplane wall or partition movement."  SECM introduced no evidence that the architect acted in bad faith or that her decision was arbitrary. SECM has not proven by a preponderance of the evidence that Paschen breached the subcontract by failing to pay this  change order and, thus, it is not entitled to recover amounts requested in Change Order 4.

Change Order 17[100] is for the cost of providing, picking up, and delivering adjustable anchors in the amount of $1,600.53. Jeff Posey testified that SECM performed this work, but no evidence was introduced showing that Paschen agreed to execute a change order or pay for this work.  Exhibit 3-414, which lists approved change orders, does not reflect that this change order was approved or paid by Paschen. SECM has not met its burden of proving that Paschen agreed to pay for the amounts requested under Change Order 17.

Change Order 24 requests an increase in the contract price in the amount of $4,559.22 because SECM was required to provide a truck to transport water from a fire hydrant across the street to the job site.[101] Jeff Posey testified that Paschen authorized this expenditure and SECM consequently provided the truck, but no change order was issued

---

[98]Exh. 1-23.

[99]Exh. 21-23.

[100]Exh. 14-43.

[101]Exh. 14-59.

and SECM was not paid. Mr. Van Zuidam could not recall receiving any invoices or documentation supporting this amount. Paschen admits that this amount was not paid. Mr. Van Zuidam testified that Paschen provided water at the fire hydrant across the street and a hose to get the water to the project site and that this was sufficient to comply with its obligation to provide water. He testified that the subcontract called for SECM to provide all tools, equipment, appliances, materials, or other things necessary for the incorporation into the project of the work described in Schedule A. Mr. Van Zuidam testified that the portable water tank used by SECM to mix mortar and grout was one of the tools, equipment, appliances, materials, or other things required to be furnished by SECM. SECM's Change Order 24 for the cost of a water truck was denied because Paschen believed it had provided water to the site and because Paschen believed SECM was obligated to provide all equipment under the subcontract, including the equipment needed to get the water across the street.[102]   On cross-examination, Mr. Lusk admitted that he had never had a masonry subcontractor provide its own water at another site. Paschen was required under the subcontract to provide water to the job site. Providing water across the street was not sufficient to satisfy Paschen's obligation under the contract to provide water to the site. SECM was forced to pay for a truck to get the water from across the street to the job site. SECM has met its burden of proving that Paschen breached the subcontract by failing to provide water to the job site. As a result, SECM is entitled to recover the amounts requested under Change Order 24.

---

[102]Testimony of Jeff Posey; Exh. 14-59

Change Order 26 was for one roll of flashing in the amount of $2,144.78.[103] Jeff Posey testified that SECM provided this material, but he could not recall whether a change order was written and whether Paschen paid SECM for Change Order 26.  No other testimony was presented with respect to this change order. SECM has not met its burden of proving that Paschen agreed to execute a change order or pay the amount requested under Change Order 26.

Change Order 27 was for adding concrete masonry units in the amount of $1,199.66.[104] Jeff Posey testified that SECM provided the material but that no change order was written. SECM has not met its burden of proving that Paschen agreed to execute a change order or pay the amount requested under Change Order 27.

Change Order 28[105]  is for additional labor costs in the amount of $10,311.44. Apparently, these costs are in addition to those on Exhibit 38-214 in support of SECM's request for payment of costs for overtime and extra crew.  For the reasons stated above with respect to SECM's claim for overtime and extra crew, SECM has not met its burden of proving that Paschen and SECM entered into an oral agreement for Paschen to pay for overtime and extra crews.  Neither has SECM proven exactly what work was done, by whom, and where.

Change Order 30 involved a change in the grout mix design and a request for

---

[103]Exh. 14-63. Although the exhibit says "total credit" this is an additive change order.

[104]Exh. 14-65.

[105]Exh. 14-67.

payment in the amount of $23,114.00.[106]  SECM requested payment of the difference in price between the grout SECM originally intended to use in the concrete masonry units ($96.00 a yard) and the higher priced grout that was used ($131.13 a yard).[107] SECM claims the change in the grout was made without its knowledge or approval.[108]  Mr. Van Zuidam testified that SECM requested the change to the more expensive grout because the less expensive grout would not work with SECM's equipment.[109]  Mr. Van Zuidam testified that SECM could have acquired a pump that would function with the original mix but it chose not to do so, and, instead, elected to use its existing pump which required the higher priced grout to operate properly. SECM did not meet its burden of proving Paschen agreed to execute a change order or pay the amount requested under Change Order 30.

SECM is entitled to recover $4,559.22 under Change 24.  Otherwise, SECM has failed to meet its burden of proving that Paschen breached the subcontract or any oral agreement and is entitled to recover no other damages.

## THE COLTON SCHOOL PROJECT

### The First Masonry Subcontractor on the Project

Mr. Van Zuidam testified that the first masonry subcontractor on the Colton project was Covasa Construction, LLC ("Covasa"). Covasa agreed in Schedule A to its subcontract to "provide all necessary labor, material, equipment, and supervision required to fabricate,

---

[106]Exh. 14-70.

[107]Exh. 26-47.

[108]Exh. 14-70; Testimony of Jeff Posey.

[109]Testimony of Larry Van Zuidam.

deliver, and install all unit masonry and/or cast stone masonry, repair existing masonry, mortar repair of existing stone masonry and all exterior stone and/or masonry cleaning indicated on the contract documents."[110]   The relevant portions of Schedule A to the Covasa subcontract for the Colton Project, regarding masonry, provide that Covasa shall:

95.   Furnish and install any and/or all cast stone masonry including specifically but not limited to all cast stone sills, copings, cornices, light shelves or any other cast stone items indicated in the contract drawings as specified as required. This shall also include installation of any cast stone items indicated in the contract drawings or any natural stone items salvaged as part of the selective demolition work as specified as required.

96.   Remove, salvage, repair and reinstall any and/or all Cornice Type B on the South Elevation indicated in the contract documents as specified as required. Reference South Elevation, 2/D202.

97.   Patch as required any and/or all masonry openings at removed entry door frames on the South Elevation indicated in the contract documents as specified as required. Reference South Elevation, 2/D202.

98.   Remove, salvage, repair and reinstall any and/or all existing cast stone panels on the North Elevation indicated in the contract documents as specified as required. Reference North Elevation, 2/D203.

99.   Remove, salvage, repair and reinstall any and/or all Cornice Type B on the North Elevation indicated in the contract documents as specified as required. Reference North Elevation, 2/D203.

100.   Remove, salvage, repair and reinstall any and/or all stone corner transitions on the North Elevation indicated in the contract documents as specified as required. Reference North Elevation, 2/D203.

101.   Remove, salvage, repair and reinstall any and/or all Cornice Type C on the North Elevation indicated in the contract documents as specified as required. Reference North Elevation, 2/D203.

102.   Remove, salvage, repair and reinstall any and/or all Cornice Type D on the North Elevation indicated in the contract documents as specified as required. Reference

---

[110]Exh. 28-20. Schedule A was the only portion of the Covasa subcontract entered into evidence.

North Elevation, 2/D203.

103.  Patch as required any and/or all masonry openings at removed entry door frames on the North Elevation indicated in the contract documents as specified as required. Reference North Elevation, 2/D203.

104.  Remove, salvage, repair and reinstall any and/or all existing cast stone panels on the East and West Elevations indicated in the contract documents as specified as required. Reference 3/D203.

105.  Remove, salvage, repair and reinstall any and/or all Cornice Type B on the East and West Elevations indicated in the contract documents as specified as required. Reference 3/D203.

106.  Patch as required any and/or all masonry openings at removed entry door frames on the East and West Elevations indicated in the contract documents as specified as required. Reference 3/D203.

127.  Clean and/or repair as required any and/or all stone and brick to remain as indicated in the contract documents as specified as required. Reference 8/A322.

129.  Clean any and/or all existing limestone that will be retained in place or that will be removed and salvaged for reinstallation as indicated in the contract documents as specified as required.[111]

Covasa abandoned the project before its completion and was terminated by Paschen.

## The SECM Letter of Intent and Subcontract

Prior to SECM's entering the Colton subcontract, Paschen and SECM signed a letter of intent dated September 22, 2011.[112] The letter of intent provided that SECM's work would include "all required labor, equipment, and supervision to perform all brick and CMU interior and exterior masonry, including all burnished CMU, and installation of previously existing and new cast stone. Also included is cleaning and restoration of existing cast stone

---

[111]Exh. 28-29, 30, 31.

[112]Exh. 27-62.

and masonry *at the main entrance*."[113] The letter of intent provided that a "formal subcontract for an aggregate price of $700,500.00" would be forwarded by Paschen to SECM.[114]

The parties entered a subcontract dated October 5, 2011 for a fixed-price in the amount of $700,500.00,[115] the same amount stated in the letter of intent.[116] SECM's work, as described in the body of the subcontract, was to "perform and furnish all the work, labor, supervision, services, insurance, plant equipment, tools, scaffolds, appliances, materials, and all other things necessary for the incorporation into the Project of the work described in Schedule A (hereinafter the "Work")."[117] SECM was to furnish the labor for the installation of the masonry, and Paschen was to furnish the "materials that were to be incorporated into the work," including brick, block, and mortar.[118]

The subcontract required change orders to be authorized and agreed to before the subcontract price increased.[119] During the course of the project, SECM's subcontract was modified by approved change orders resulting in a net increase of $47,206.21 to the

---

[113]Exh. 27-62 (emphasis added).

[114]Unlike the Osborne subcontract, SECM was not required to furnish materials on the Colton project.

[115]Exh. 2-1.

[116]Section 30 of the subcontract provides that disputes shall be governed by Illinois law, but both parties agree that Louisiana law applies.  See R. Docs. 53 and 57.

[117]Exh. 2-2.

[118]Testimony of Larry Van Zuidam.

[119]Exh. 2-8.

subcontract price, bringing the total fixed-price amount to $747,706.21.[120] SECM was paid

$353,319.18.[121] There was a remaining contract balance on the Colton project in the amount

of $394,387.03.[122]

The relevant portions of Schedule A to the SECM subcontract for the Colton Project,

regarding masonry, provide that SECM shall:

83.   Install any and/or all cast stone masonry including specifically but not limited to all cast stone sills, copings, cornices, light shelves or any other cast stone items indicated in the contract drawings as specified as required. This shall also include installation of any cast stone items indicated in the contract drawings or any natural stone items salvaged as part of the selective demolition work as specified as required.

84.   Repair and reinstall any and/or all Cornice Type B on the South Elevation indicated in the contract documents as specified as required. Reference South Elevation, 2/D202.

85.   Patch as required any and/or all masonry openings at removed entry door frames on the South Elevation indicated in the contract documents as specified as required. Reference South Elevation, 2/D202.

86.   Repair and reinstall any and/or all existing cast stone panels on the North Elevation indicated in the contract documents as specified as required. Reference North Elevation, 2/D203.

87.   Repair and reinstall any and/or all Cornice Type B on the North Elevation indicated in the contract documents as specified as required. Reference North Elevation, 2/D203.

88.   Repair and reinstall any and/or all stone corner transitions on the North Elevation indicated in the contract documents as specified as required. Reference North Elevation, 2/D203.

89.   Repair and reinstall any and/or all Cornice Type C on the North Elevation indicated in the contract documents as specified as required. Reference North Elevation,

---

[120]Exh. 5-81.

[121]Stipulated by the parties.

[122]Doc. 66 at 9.

2/D203.

90.     Repair and reinstall any and/or all Cornice Type D on the North Elevation indicated in the contract documents as specified as required. Reference North Elevation, 2/D203.

91.     Patch as required any and/or all masonry openings at removed entry door frames on the North Elevation indicated in the contract documents as specified as required. Reference North Elevation, 2/D203.

92.     Repair and reinstall any and/or all existing cast stone panels on the East and West Elevations indicated in the contract documents as specified as required. Reference 3/D203.

93.     Repair and reinstall any and/or all Cornice Type B on the East and West Elevations indicated in the contract documents as specified as required. Reference 3/D203.

94.     Patch as required any and/or all masonry openings at removed entry door frames on the East and West Elevations indicated in the contract documents as specified as required. Reference 3/D203.

115.    Clean and/or repair as required any and/or all stone and brick to remain as indicated in the contract documents as specified as required. Reference 8/A322.

117.    Clean any and/or all existing limestone that will be retained in place or that will be removed and salvaged for reinstallation as indicated in the contract documents as specified as required.[123]

Paschen terminated the Colton subcontract with SECM in July of 2012.[124]

Paschen and SECM agree on the facts set forth above with respect to the Colton project and they are the findings of the Court. Beyond the above, the parties dispute most of the facts.

---

[123]Exh. 2-26, 27, 28.

[124]Testimony of Robert Perez and Jeff Posey, uncontradicted by the testimony of Paschen's witnesses.

42

**Paschen's Claims**

Paschen claims damages in the amount of $807,260.71[125] as a result of SECM's breach of its subcontract by failing to timely perform, failing to complete its undisputed scope of work, failing to correct its non-compliant work, and for improperly filing a statement of claim on this public works project.[126]   The category "FHP Expenses to Correct/Complete" the Colton project on Exhibit 42-1 lists the expenses Paschen claims it was required to pay to correct or complete the work not done by SECM under the Colton subcontract as a result of SECM's breach.  Paschen calculated these damages by adding the total costs allegedly incurred by Paschen to correct and complete SECM's work and the costs for releasing the wrongly filed statement of claims, for a total of $1,201,647.74, and subtracting the remaining contract balance of $394,387.03.[127]

Section 24 of the Colton subcontract provides, in pertinent part, it shall be an event of default "if a Subcontractor should: 1) refuse or neglect to supply sufficient workmen or materials of the proper quality and quantity; 2) fail in any respect to prosecute the Work with promptness and diligence, or cause the stoppage, delay, interference with, or damage to the work of Contractor and Owner or any other contractors or subcontractors on the Project; 3) fail to perform in accordance with any of the terms or provisions of this Agreement or of the other Contract Documents."[128]   The subcontract further provides that

---

[125]Exh. 42-1.

[126]R. Doc. 66 at 1.  The claim regarding damages for the improper filing of a statement of claim on the Colton project is denied for the same reasons given under the Osborne Subcontract.

[127]R. Doc. 66 at 9.

[128]Exh. 2-15.

upon the occurrence of a defined event of default, the contractor shall  have the right, in addition to any other remedies under the subcontract or under law, "after forty-eight (48) hours notice to Subcontractor: a) to perform and furnish any such labor and materials for the Work and to deduct the cost thereof from any moneys due or to become due to Subcontractor under the Agreement; and/or b) terminate the employment of Subcontractor, for all or any portion of the Work, enter upon the premises and take possession, for the purpose of completing the Work, of all materials, and other items thereon, all of which Subcontractor hereby transfers and assigns to Contractor for such limited purpose and for whatever period of time is necessary for completion of the Work. In case of such termination of the employment of Subcontractor, Subcontractor shall not be entitled to receive any further payment under this Agreement until the Work shall be wholly completed to the satisfaction of Contractor, Owner, and Architect, and shall have been accepted by them, at which time, if the unpaid balance of the amount to be paid under this Agreement shall exceed the cost and expense incurred by Contractor and/or Owner in completing the Work, such excess shall be paid by Contractor the Subcontractor; provided, however, that if such cost and expense shall exceed such unpaid balance, the Subcontractor shall pay the difference to the Contractor."[129]

On July 6, 2012, Rock Sumrall, the Colton project manager, sent a letter to Jeff Posey captioned "Forty (48) Eight Hour Notice" (the "48 hour notice letter").[130]  In the 48 hour notice letter Paschen informed SECM that SECM had 48 hours to comply with Section 9 of

---

[129]Exh. 2-15.

[130]Exh. 27-3.

the subcontract,[131] captioned "Timely Execution of the Work," by completing "all work listed in the items above" by 7:00 a.m on Monday, July 9, 2012, or the subcontract would be terminated.[132]   Paschen listed three events of default to be corrected within the 48 hour period:

> "No. 01) SCM's refusal to comply with instructions from Mr. Bill Taylor not to dismantle and/or move scaffolding in areas where exterior walls were not yet topped out.
>
> No. 02) SCM's refusal to transport cast stone from Baton Rouge to the jobsite included in F. H. Paschen's Change Order No. 01, Item No. 01.
>
> No. 03) SCM's refusal to spread, clean and repair the original cast stone specifically included in Southeastern Commercial Masonry's Subcontract."[133]

Mr. Van Zuidam testified that SECM stopped doing any work on the project around the date of the 48 hour notice letter but he could not give an exact date.  Rupert Perez, SECM's superintendent on the Colton project, testified that Thomas Ryan, Paschen's superintendent, told Mr. Perez to gather his things and get off the job within three days. Mr. Perez was not able to recall the date of this conversation, but Jeff Posey testified that it occurred within three days of the 48 hour notice letter.  After this termination of the subcontract by Paschen, the SECM workers left the job.  Paschen failed to document what remained to be done on the Colton project at this time either in writing or by photographs, and, because the project was in its early stages, there was no punch list.

---

[131]Exh. 2-6.

[132]The 48 hour notice provision in Section 9 applies only to the provision of additional labor and supervision to work overtime and does not address Paschen's right to recover the cost of the work.  The 48 hour provision on which Paschen relies is in Section 24.

[133]Exh. 27-3.

Paschen had already arranged for third parties to complete a portion of the work under the subcontract before it sent the 48 hour notice letter to SECM.[134] Mr. Perez testified that the Paschen scaffolding had been on the job site for two weeks and had actually been erected in some locations three days before SECM was ordered to leave the job.

Paschen seeks the costs it incurred to complete the work under the provisions of Section 24 by offsetting those costs against any remaining amounts owed to SECM under the subcontract and recovering the excess from SECM. For Paschen to recover its costs to complete the work under Section 24 of the subcontract, it must first prove that the three events of default listed in the 48 hour notice letter actually occurred.

With respect to the first event of default, Paschen must prove that SECM's failure to comply with Mr. Taylor's instructions not to dismantle and/or move the scaffolding is an event of default under the subcontract.[135] On the Colton project, SECM was an independent contractor paid on a fixed price basis for performance of a specific job, responsible for furnishing its own tools and materials and with the right to control the conduct of its work. *See, e.g.*, *Villaronga v. Gelpi P'ship No. 3*, 536 So. 2d 1307, 1311 (La. App. 5 Cir. 1988). Paschen has not pointed to any provision of the subcontract giving it the right to control SECM's methods and means of performing the work, such as directing the placement or movement of SECM's scaffolding. Under Section 9 of the subcontract, SECM as the subcontractor had the obligation to perform the work "diligently, promptly, and in such order and sequence as Contractor may direct to assure the efficient, expeditious and timely

---

[134]Testimony of Larry Van Zuidam, Rupert Perez, and Jeff Posey.

[135]Neither party clarified exactly what amount of scaffolding was up and where it was located on the date of the 48 hour notice letter, or 48 hours thereafter for that matter.

prosecution of the entire work for the Project."[136]   Paschen's right under Section 9 to direct the order and sequence of the work does not relate to the performance of the work, but only the order and sequence in which it is done.  *See Trapani v. Jefferson Parish*, 180 So. 2d 850, 852−53 (La. App. 4 Cir. 1965). In fact, contractors such as Paschen typically eschew the exercise of control over subcontractors in order to hold subcontractors responsible for their performance and also to avoid liability to third parties.  *See, e.g.*, *Sims v. Cefolia*, 890 So. 2d 626, 631 (La. App. 5 Cir. 2004); *Migliori v. Willows Apartments*, 727 So. 2d 1258, 1261 (La. App. 4 Cir. 1999); *Villaronga v. Gelpi P'ship No. 3*, 536 So. 2d 1307, 1311 (La. App. 5 Cir. 1988); *Trapani v. Jefferson Parish*, 180 So. 2d 850, 852−53 (La. App. 4 Cir. 1965). Because Paschen did not have the right to instruct SECM not to dismantle or remove scaffolding, or to replace it within 48 hours if it had been dismantled or removed, Paschen has failed to meet its burden of proving that SECM's failure to comply with the instructions of Mr. Taylor within 48 hours was an event of default under the subcontract.  If the action of SECM was not an event of default, it cannot serve as the basis for the 48 hour notice letter.  Likewise, SECM's failure to comply with the 48 hour notice letter cannot serve as the basis for Paschen to recover the cost of completing the work.

    With respect to the second event of default, Paschen must prove it was an event of default under the subcontract for SECM to refuse to transport the precast stone from Baton Rouge to the Colton job site.[137]   In determining this issue, it is helpful to briefly describe the precast stone and explain its peripatetic history.

---

[136]Exh. 2-7.

[137]Although there is a dispute as to whether SECM actually moved some part of the stone, there is no dispute that SECM did not move all the stone.

As Mr. Van Zuidam explained, there were decorative precast stone pieces, including cornices, in the original brick veneer of the Colton School.  As part of its subcontract, Covasa removed and disposed of or recycled the original bricks from the veneer.  The design of the renovation called for the repair and reinstallation of the original decorative precast stone pieces in the new brick walls.  Covasa removed the precast stone and transported it to its yard in Baton Rouge, Louisiana.[138]  There is no dispute that the precast stone in the Covasa yard was broken into pieces and needed to be organized, cleaned, repaired, and then reinstalled.  Mr. Perez testified, and Paschen does not dispute, that the pieces of the precast stone were scattered around the Covasa yard in no particular order.[139]

The parties agree that all materials on the Colton project were to be supplied by Paschen to the job site, and, as a result, moving the precast stones from Baton Rouge to the job site was not included under SECM's subcontract.[140]   Jeff Posey and Mr. Perez testified that they had not seen the precast stone before a change order was issued.  Jeff Posey testified that Paschen represented to him that the stone was on pallets and ready to be moved, not scattered around in pieces in the Covasa yard.  Change Order 1, dated October 27, 2011, increased the subcontract price by $12,353.50 to compensate SECM for *moving* the original precast stone from the Covasa yard in Baton Rouge to SECM's storage yard in Slidell, Louisiana.[141]

---

[138]Testimony of Mr. Larry Zuidam.

[139]Testimony of Rupert Perez.

[140]Exh. 2.

[141]Exh. 12-1.

Mr. Perez testified that, after the change order was issued, he went to the Covasa yard in Baton Rouge. He took four laborers with him and stayed in Baton Rouge for a week attempting to organize and prepare the precast stone for transport. He found this to be an impossible task without direction from Paschen and the project architect. Mr. Van Zuidam testified that the drawings for the project showed where each piece of precast stone was to be installed, but no such drawings were introduced as exhibits and the Court finds that they did not exist. He identified Exhibit 28-12 as a photograph of the precast stone after his laborers put the pieces on pallets. In his opinion, 90 percent of the precast stone could not be reused because it was broken or otherwise damaged. Jeff Posey concurred in this evaluation of the precast stone. Jeff Posey testified that even Mr. Pritchett said that 90 percent of the precast stone would have to be remade. It is not clear what portion of the precast stone was actually used in the renovation.

Mr. Van Zuidam testified that SECM did not move any of the precast stone to Slidell, as called for by Change Order 1, or to the Colton job site. Mr. Perez and Jeff Posey testified that SECM did move some small portion of the precast stone to New Orleans, so the architect could see it, but neither testified as to exactly how much was moved by SECM.[142] Neither party established by a preponderance of the evidence exactly what portion of the precast stone SECM moved and what portion of the precast stone Paschen moved. In any event, it is clear, and SECM does not dispute, that all or most of the precast stone was moved from Baton Rouge to the Colton job site by Paschen.[143]

---

[142]See Exh. 5-4.

[143]Exh. 27-13.

In late 2011, Mr. Pritchett sent several emails to Jeff Posey and others at SECM asking when SECM's lay down yard would be ready for Paschen to observe the existing precast stone.[144]  SECM witnesses testified that the precast stone could not be moved until representatives of Paschen and/or the architect sorted and organized the pieces to determine which pieces would be reused. Mr. Perez testified it was his understanding that Paschen's superintendent, rather than SECM, was to decide which precast stone could be reused and, as a result, which precast stone should be moved.  Jeff Posey testified that he made several calls asking Paschen to come to Baton Rouge to look at the precast stone to see what could be used.  Jada Miller, an SECM employee, emailed Mr. Pritchett on January 6, 2012, asking that Paschen and its cast stone supplier meet SECM in Baton Rouge to look at the precast stone to determine what could be salvaged and what needed to be discarded.[145] Mr. Sumrall responded by email that there was no reason to have the cast stone supplier look at the existing precast stone and that the architect had repeatedly refused to go to Baton Rouge.  Mr. Sumrall suggested that SECM take on the task of bringing the pieces it thought could be repaired to the job site, taking photographs of the pieces, and then making the repairs onsite at which time the repairs would be reviewed by the architect for a determination of whether the stone would be acceptable.[146]  In an email sent on January 6, 2012, from Bill Taylor, a Paschen employee, to Mr. Van Zuidam and others, Mr. Taylor admitted that the project architect would not take Paschen's word on what precast stone

---

[144]Exh. 25-60, 25-61, 25-62, 25-63.

[145]Exh. 28-54.

[146]Exh. 28-53.

should be used or not used.[147]   On March 27, 2012, Mr. Sumrall emailed Jeff Posey and others at SECM saying, "We understand now there are additional issues that have come up with regard to precast placement.  We need to get a meeting together to try to resolve these issues."[148]  On April 16, 2012, Jeff Pritchett emailed Jeff Posey and others at SECM saying that the project was "quickly approaching the period in the schedule when we will be reinstalling the salvaged cornice pieces" and requesting a date when the SECM yard would be ready for Paschen to view "each type of stone laid out into separate piles for quantity assessment."[149]  Mr. Pritchett followed up with a letter to Jeff Posey dated April 30, 2012, again requesting that SECM move the precast stone and "sort it into piles" so Paschen could determine what needed to be reordered.[150]   On May 18, 2012, Mr. Pritchett emailed Jeff Posey and others at SECM asking that Mr. Perez and two SECM laborers meet Paschen in Baton Rouge to begin sorting the precast stone that Paschen would take it back to Kenner, and saying that this "is all we will need for SECM's involvement from this point on regarding the cast stone relocation."[151]  By June 22, 2012, Paschen had moved the precast stone from Baton Rouge to New Orleans but the parties were still at odds over who had the obligation to sort the stone to determine what could be reused.[152]

---

[147]It seems even less likely the architect would have accepted SECM's opinion about what precast stone could be reused.

[148]Exh. 27-42.

[149]Exh. 25-64.

[150]Exh. 25-58.

[151]Exh. 28-69.

[152]Exh. 27-12.

In his July 6, 2012 letter in response to the 48 hour notice letter, Jeff Posey said that Mr. Zuidam had directed SECM on several occasions, via emails, texts, and telephone calls, not to move the stone because of its bad condition.[153]   Jeff Posey testified at trial that, because SECM did make several trips to Baton Rouge but did not move the precast stone, on May 24, 2012, SECM proposed a credit to Paschen in the amount of $3,475.13 via Change Order 20.[154]   Mr. Van Zuidam testified that SECM's proposal in Change Order 20 was unjustified and was rejected.   Instead, Paschen suggested a credit to Paschen in the amount of $9,500.00 was appropriate given the small amount of work SECM had done.[155] Mr. Posey stated in his July 6, 2012 letter to Mr. Sumrall that  a credit on the subcontract price had been given to Paschen,[156]  but it was unclear from the record whether a credit was given and, if so, in what amount.

While Covasa's subcontract called for it to "salvage" the precast stone,[157] Mr. Van Zuidam acknowledged that SECM's did not.[158]  SECM agreed in Change Order 1 to *move* the precast stone, not to salvage, sort, or organize the precast stone or to determine which pieces could be used.   Paschen repeatedly insisted that SECM sort and evaluate the precast stone when this was not SECM's obligation under Change Order 1.   Mr. Van Zuidan directed SECM not to move the precast stone.   By the date of the 48 hour notice letter, the

---

[153] Exh. 26-146.

[154]Exh. 16-45.

[155]Exh. 27-25, Exh. 27-29 to 34, Exh. 28-56.

[156]Exh. 26-146.

[157]Exh. 28-30.

[158]Exhs. 2-26 and 2-27.

precast stone had been moved by Paschen to New Orleans.  For SECM to have moved the precast stone under Change Order 1, the precast stone had to be sorted and the portion to be reused identified.  SECM was not responsible for evaluating the condition of the precast stone, sorting it, and deciding what could be reused; Paschen was.  Mr. Van Zuidam acknowledged that the subcontract did not say that SECM had to salvage, sort, or organize the precast stone and, instead, he said it was a "known fact" that SECM had to do so. Paschen and the project architect refused to go to the Covasa yard in Baton Rouge to identify the precast stone that could be reused, thus rendering SECM's performance of its obligation to move the precast stone impossible.   Because Paschen made SECM's performance impossible, Paschen cannot recover for SECM's failure to perform. *See Lake Forest, Inc. v. Katz & Besthoff No. 9,* 391 So. 2d 1286, 1289 (La. App. 4 Cir. 1980) (quoting *Cox v. Dep't of Highways*, 209 So. 2d 9, 11 (La. 1968)).  Paschen has failed to meet its burden of proving by a preponderance of the evidence that SECM's failure to move the precast stone was an event of default under Change Order 1 to the subcontract.[159]

With respect to the third event of default, Paschen must prove that it was an event of default for SECM to refuse to spread, clean, and repair the precast stone.[160]  The Court has found that SECM did not have an obligation to sort or organize the precast stone or to

---

[159]Neither party introduced evidence establishing what portion of Change Order 1 was credited to Paschen and the Court is unable to discern the amount from the record.

[160]SECM agrees that it had the obligation to "spread the stone" but this is to be distinguished from the obligation to determine which stone could be reused which the Court agrees it does not have."

decide which portions would be reused.[161] Instead, Paschen had the obligation to furnish the materials for the project, including sorting the precast stone and determining what portion could be used and where.  By the date of the 48 hour notice letter, Paschen had moved the precast stone but had not sorted it.  It is not necessary for the Court to determine whether, if Paschen had timely complied with its obligation to sort the precast stone, SECM would have had the obligation to spread, clean, and repair the precast stone.  Even if SECM had the obligation to spread, clean, and repair the precast stone once the precast stone had been moved and sorted, it would have been impossible for SECM to perform within 48 hours of the notice letter because Paschen had failed to comply with its obligation to sort the precast stone.  Paschen has not proven by a preponderance of the evidence that SECM was in default under Item No. 3 of the 48 hour notice letter.

Recovery is available under Section 24 of the subcontract only if there was an event of default and, after 48 hours notice, SECM could have but failed to remedy the default. Paschen has failed to meet its burden of proving by a preponderance of the evidence that any of the three events of default listed in the 48 hour notice letter actually occurred, or that, if a default did occur, remedy was possible.  As a result, Paschen is not entitled to recover its costs for materials and labor to complete the work under Section 24 of the subcontract.

In the event that one of events of default did occur, the Court finds that Paschen has failed to prove its damages by a preponderance of the evidence. Paschen did not evaluate

---

[161]Change Order 1 provided that SECM would "move" the precast stone.  The subcontract says "repair and reinstall." The basis of Paschen's claim that SECM was obligated to spread and clean the stone remains unknown.

or document the work that needed to be completed or corrected at the time SECM left the job and no punch list exists for that time period. Paschen failed to prove the amounts incurred to complete or correct SECM's portion of the work. The amounts claimed by Paschen include payments for materials when SECM was only obligated to provide labor on the project. Paschen was unable to distinguish between the work done to correct errors of Covasa, SECM or even Paschen, as Paschen completed much of the masonry work with its own forces. Mark Waller, the project manager for Rush Masonry, did not know whether the work his employer did was to complete or correct work that was to be done by SECM under the subcontract, as opposed to the work of Covasa or Paschen. No evidence was introduced to prove that Rush Masonry corrected any of SECM's work or completed work SECM failed to complete. Mr. Waller did not know who installed any particular brickwork at the Colton project before Rush Masonry arrived. Mr. Waller testified that for the most part SECM's work on the Colton project was done in a "professional manner."[162] Mr. Hase did not work for Paschen when the work was being done and could not testify from his own knowledge as to what work was done by Rush Masonry or Paschen and whether the work done by them after termination of the subcontract was within the scope of SECM's subcontract, as opposed to additional work or work made necessary by others.

**SECM's Counterclaim**

SECM has requested total damages in the amount of $207,518.29 for amounts of work done and invoiced under the subcontract but not paid; back charges for additional scaffolding costs; changes orders for which work was done but not paid; retainage withheld;

---

[162]Testimony of Mark Waller.

and lost profit because of improper termination and not allowing SECM to complete the work.  Under Louisiana law, SECM must prove that it is entitled to recover on its crossclaims by a preponderance of the evidence.

SECM seeks damages in the amount of $65,320.99 for Paschen's failure to pay the "Current Payment Due" under Pay Application 17 for the period ending July 2, 2012.[163]  The parties agree that Paschen did not execute Pay Application 17 and did not pay it.  The work in place for which payment is requested under Column E of Pay Application 17 is for the north wall brick and precast, the east wall brick and precast, and the laying of CMU over doorways, all of which is work to be done under the subcontract.[164]  Paschen argues that Pay Application 17 was submitted after SECM abandoned the project.  It is true that Pay Application 17 was signed on August 1, 2012, but the work for which payment is requested was done before the 48 hour notice letter.  Further, Paschen terminated the subcontract and SECM left the job several days later, not because it was abandoning the job, but because it was ordered to do so by Paschen.  SECM has established by a preponderance of the evidence that this was work covered by the subcontract and that the work was performed by SECM before Paschen terminated the subcontract.  SECM is entitled to recover the amounts owed under Pay Application 17.

SECM requests damages in the amount of $76,682.34 under Pay Application 18.[165] Jeff Posey testified that "Back Charge 1" is for SECM's scaffolding sitting at the job site

---

[163]Exh. 5-83.

[164]Exh. 2.

[165]Exh. 5-83.

unused for a month while SECM waited for the precast stone to be sorted by Paschen.  Jeff Posey testified that "Back  Charge 2" is SECM's cost for tearing down the scaffolding, loading it, and hauling it away.  Exhibits 28-17 and 28-18 were offered as the back-up for Pay Application 18, but they provide no explanation of or detailed support for the amounts claimed.  SECM failed to establish exactly where the scaffolding was installed, how long it was there, what work was being performed, what the cost was to dismantle and move the scaffolding, and how it calculated its $1,800.00 a day charge. The subcontract required SECM to provide its own equipment on the Colton project.  The subcontract does not reference back charges payable to the subcontractor and provides no right for SECM to recover such charges.  Instead, Section 11(a) of the subcontract provides the remedy for delay to SECM in the "commencement, prosecution or completion of the Work by the act, omission, neglect or default" of Paschen is "an extension of time in which to complete its Work."[166]  SECM's request for payment related to the scaffolding is denied both because SECM failed to prove by a preponderance of the evidence the amount of the damages it sustained and because the subcontract does not allow recovery of these damages by the subcontractor.

SECM requests damages in the amount of $12,280.21 as partial payment for Change Orders 2, 3, 4, 5, 6, 7, 11, 12, 13, 20 (credit to Paschen), and 22.[167] SECM claims these change orders are for work done under the subcontract but not paid in full as invoiced.[168]   The

---

[166]Exh. 2-8.

[167]Exhs. 16-3, 5, 7, 9, 11, 3, 27, 29, 31, 45, and 51, respectively.

[168]Exh. 40-1 details the portions of the change orders that have been paid according to SECM.

copies of the change orders introduced into evidence were not signed by Paschen.  Jeff Posey did not know whether all of the work shown in the change orders had been done. Neither did he know which change orders had been paid for and which had not.  SECM failed to prove by a preponderance of the evidence exactly what work was performed or that the work performed was included in the work under the subcontract.  SECM failed to prove by a preponderance of the evidence that Paschen signed the change orders or approved the work to be done by oral agreement.  SECM failed to prove by a preponderance of the evidence that  Paschen agreed to the amount to be charged for the work.  SECM failed to prove by a preponderance of the evidence which change orders had been paid and which had not.  SECM is not entitled to recover for change order requests 2, 3, 4, 5, 6, 7, 11, 12, 13, 20 (credit to Paschen), and 22. .

SECM requests its retainage not paid in the amount of $22,033.70.[169]  SECM is entitled to recover the retainage withheld in connection with payments made under the subcontract in the amount of $22,033.70.

SECM requests payment of its anticipated profits in the amount of $31,201.05, which is 10 percent of the balance to finish the subcontract because the subcontract was terminated by Paschen without cause. The subcontract provides that, if Paschen terminated the subcontract and SECM was not in default, SECM is entitled to "the value of the work performed and the materials furnished." However, the subcontract clearly provides that SECM is not entitled to "anticipated profits on work unperformed or on materials or

---

[169]See all Pay Applications in Exhibit 5; Exh. 40-17.

equipment unfurnished" if the contract is terminated.[170]  SECM is asking for anticipated profits on work it did not perform, but it has no right to recover under the language of the subcontract.

SECM has not pursued its claim for damages based on unjust enrichment.  In any event, because SECM has a remedy at law under the contract, SECM is not entitled to recover under a theory of unjust enrichment.

## ATTORNEY'S FEES AND COSTS

In the original and amended Pretrial Order and in its post-trial brief,[171] Paschen seeks attorney's fees and costs from SECM for breach of both subcontracts.  Paschen did not request attorney's fees in its initial or amended complaint,[172] but the issue of entitlement to attorneys' fees was tried by consent of the parties.[173]  Under Louisiana law, attorneys' fees are recoverable only where provided for by contract or statute.[174]  Paragraph 24 of both subcontracts includes the following language:

> In the event it becomes necessary for the Contractor to collect any deficiency from the Subcontractor by legal action, the Subcontractor agrees to reimburse Contractor for all of its reasonable attorney's fees and costs incurred in connection with such action.[175]

SECM's failure to pay Tailored Foam, or to reimburse Paschen for its payment to Tailored

---

[170]Exh. 1-15.

[171] R. Docs. 40, 44, 62, and 66.

[172]*See* R. Docs. 1, 4.

[173]Fed. R. Civ. P. 15(b).

[174]*See, e.g.*, *Stutts v. Melton*, 130 So. 3d 808, 814 (La. 2013) (citations omitted).

[175]Exh. 1-14; Exh. 2-15.

Foam, is a breach of the Osborne subcontract, and this action was necessary for Paschen to collect the deficiency owed.

The Court has considerable discretion in choosing whether to award Paschen attorney's fees. *See Lamar Contractors, Inc. v. Kacco, Inc.*, 174 So. 3d 82, 90 (La. App. 4 Cir. 2015) (citations omitted). Because only a portion of the sought-after damages is recoverable, the court is within its discretion to award only a portion of the prevailing party's attorney's fees. With respect to the Osborne subcontract, Paschen has been awarded as damages only the amount it paid to Tailored Foam. Accordingly, the Court will award Paschen reasonable attorneys' fees and costs only insofar as this action was necessary to collect the payment made by Paschen to Tailored Foam.

SECM contends Paschen is responsible for its attorneys' fees and costs under both subcontracts. Unlike Paschen, SECM prayed for reasonable attorneys' fees in its counterclaim.[176]

It is clear that Section 24 of the subcontract only provides for the recovery of attorneys' fees by the contractor—Paschen—not the subcontractor—SECM. After an in-depth review of both subcontracts, the Court has not identified any other contractual provisions entitling SECM, as a subcontractor, to recover attorneys' fees from Paschen.

Neither is SECM entitled to recover attorneys' fees by statute. The only provision in the Public Works Act on attorneys' fees is set forth in Louisiana Revised Statutes section 38:2246, which provides for the recovery of 10 percent attorney's fees when a claimant recovers "the full amount of his timely and properly recorded or sworn claim." Accordingly,

---

[176]R. Doc. 6 at 9.

in this case if SECM had recovered the full amount of its claims against Paschen, it could also have recovered attorneys' fees from Paschen. However, as stated at length herein, SECM is not entitled to recover the full amount of its claims against Paschen and is consequently not entitled to attorneys' fees under the Public Works Act.[177]

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that judgment be entered in favor of Paschen and against SECM on the Osborne subcontract in the amount of $52,901.70

**IT IS FURTHER ORDERED** that judgment be entered in favor of SECM and against Paschen on the Osborne  subcontract in the amount of $4,559.22.

**IT IS FURTHER ORDERED** that judgment be entered in favor of SECM and against Paschen on the Colton  subcontract in the amount of $87,354.69.

**IT IS FURTHER ORDERED** that interest on amount awarded is due from date of judicial demand.

**IT IS FURTHER ORDERED** that judgment be entered in favor of Paschen and against SECM for attorney's fees and costs insofar as this action was necessary for Paschen to recover its payment to Tailored Foam as a result of SECM's breach of the Osborne subcontract.  Paschen  is given 14 days from this date to submit competent evidence supporting its claim for attorney's fees and costs.  SECM is given 14 days from the date of filing to file its opposition.

---

[177] SECM filed a Sworn Statement of Amount Due on the Osborne project pursuant to Louisiana Revised Statutes section 38:2241, *et. seq.*, in the amount of $278,251.44.  See Exhibit 17. SECM filed a Sworn Statement of Amount Due on the Colton project pursuant to Louisiana Revised Statutes section 38:2241, *et. seq.*, in the amount of $293,865.69. See Exhibit 18.

New Orleans, Louisiana, this 10th day of November, 2015.

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**